AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
District of Maryland

| | |
|---|---|
| United States of America<br>v.<br>  SURAJ TAIRU<br><br>_____<br>*Defendant(s)* | )<br>)<br>)  Case No.  13-2191 CKG<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 22, 2013 _____ in the county of _____ in the _____ District of _____ Maryland _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sec. 841 | Distribution of controlled substances, to wit: heroin |

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

SEP 1 2 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Craig Jester
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 09/12/2013 _____

_____
*Judge's signature*

City and state:        Baltimore, Maryland

Susan K. Gauvey, United States Magistrate Judge
_____
*Printed name and title*

13-2191 SKG

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

### I.   AFFIANT AND EXPERTISE

Your Affiant, Craig Jester, after being duly sworn, states as follows:

1.      I am an "investigative or law enforcement officer ... of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Detective with the Baltimore Police Department (BPD) and have been so employed since 2001. I have been deputized as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) for over two years. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed recorded conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users.

3.      Through training, education and experience, I have become familiar with

1

the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

## II.    BACKGROUND

4.    In September 2012, DEA SIG began conducting an investigation of drug trafficking and violence associated with the Black Guerilla Family (BGF). Through the course of that investigation, Suraj TAIRU, was identified as a source of supply of a high ranking member of the BGF.

5.    Over the course of the investigation, agents have conducted extensive physical and electronic surveillance, made use of confidential informants, conducted car stops and observed the sale of narcotics. Investigators have also made use of the interception of wire communication of the phone used by this high ranking BGF member. I have participated in this investigation and from my personal participation in this investigation, as well as reports made to me by other agents and officers of the BPD and other law enforcement authorities, I am familiar with the facts and circumstances of this investigation.

6.    As a result of this investigation, more fully described below, there is probable cause to believe that Suraj TAIRU distributed and possessed with the intent to distribute heroin in violation of 21 U.S.C. § 841.

7.    Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint charging TAIRU with the above described federal offense, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on my review of the audio recordings. Because this investigation relied upon the interception of wire communication, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in brackets my "translation" of the words or terminology used. These interpretations, as well as my opinions contained herein, are based upon my training, experience and my knowledge of BGF and this particular DTO's operation.

## III.    PROBABLE CAUSE

### A. CONFIDENTIAL SOURCE INFORMATION

12.    In March of 2013, law enforcement debriefed a source of information registered with and controlled by the Baltimore Police Department, herein referred to as CS-12. CS-12, who has been cooperating with law enforcement for several years, has conducted controlled purchases of narcotics in the past and provided information which has led to several arrests and seizures of controlled dangerous substances and firearms. CS-12's information has

3

been corroborated to the extent possible and proven to be reliable. CS-12 told investigators that a high ranking member of BGF, whom CS-12 identified by his nickname was selling a lot of heroin in Baltimore City. CS-12 stated that this individual was a long-time, high ranking member of the BGF[1].

13.     Also in March of 2013, law enforcement debriefed another source of information registered with and controlled by the Baltimore Police Department, herein referred to as CS-13. CS-13's information has been corroborated to the extent possible and proven reliable. CS-13 also told investigators that this same high-ranking BGF member was currently selling high quality wholesale quantities of heroin in Baltimore City, and provided a cellular telephone number for him.

14.     Law enforcement was able to obtain authorization to intercept the wire communication of this high-ranking BGF member (hereinafter "the BGF member") over the telephone number provided by CS-13.

## B. DISTRIBUTION OF HEROIN BY TAIRU

15.     Beginning on June 19, 2013, during a series of telephone calls intercepted, pursuant to the federally authorized interception of wire communication of the BGF member's cellular telephone, the BGF member spoke to an individual, who was utilizing telephone 202-256-5731, later identified as TAIRU[2,3]. During this series of telephone calls, the BGF member

---

[1]     The identity of this BGF member and his association with BGF has been known to law enforcement since at least 2010.

[2]     Unless otherwise noted, all intercepted communication between the BGF member and TAIRU occurred between the BGF member's cellular phone subject to interception and 202-256-5731, utilized by TAIRU.

[3]     The user of 202-256-5731was originally incorrectly identified as Uche ODUNZEH, an individual associated through a database search with Mariwo Enterprises, the registered owner of TAIRU's Ford F-150 truck.

discussed meeting TAIRU the upcoming weekend. TAIRU also told the BGF member to have some money available when they meet.

16.     I knew from other intercepted conversations over the BGF member's cellular phone that the BGF member had been waiting for his source of supply to obtain a new shipment of heroin.

17.     On June 22, 2013, at approximately 9:39 a.m., the BGF member received a call from TAIRU. During that conversation, the two discussed meeting later that day around two o'clock in the afternoon.

18.     At approximately 1:03 p.m., the BGF member received another call from TAIRU. During that conversation, TAIRU asked the BGF member how many "blocks" he was looking for. The BGF member told TAIRU that he (the BGF member) was not sure and that he (the BGF member) would call TAIRU when he (the BGF member) finished in the bank.

19.     Based on this call, I believed that TAIRU wanted to know specifically how much heroin ("blocks"), the BGF member wanted.

20.     After another series of telephone calls, at approximately 3:15 p.m., the TAIRU advised the BGF member that he (TAIRU) would be traveling to the White Marsh area of Baltimore County and wanted to know if the BGF member could meet him (TAIRU) there. The BGF member advised TAIRU that he could and the two agreed to meet at "the first restaurant" where they would "take care of that one and then take care of the rest later."

21.     I recognized the use of the term "first restaurant" as a code previously utilized by the BGF member and TAIRU to conceal the location of their meetings. I further believed that at that meeting TAIRU would provide a small quantity of heroin to the BGF

5

member (a sample), and would return at a later time with the rest of the heroin ("take care of that one and then take care of the rest later").

22.     Based upon the conversations, surveillance was established in the White Marsh area. While at that location, law enforcement observed TAIRU operating his Ford F-150 truck, which was occupied by two other individuals. Law enforcement had previously placed a GPS tracking device on this vehicle.

23.     At approximately 5:36 p.m., the BGF member called TAIRU. During that call TAIRU and the BGF member again discussed whether to meet at "the first restaurant" or "the second restaurant" with TAIRU telling the BGF member that he (TAIRU) was within two or three blocks of "the first restaurant." The BGF member ultimately told TAIRU to meet at "the second restaurant."

24.     Surveillance units followed TAIRU to the Rite Aid located at 250 West Chase Street where TAIRU briefly parked his Ford F-150 truck. Surveillance units also noted that a Baltimore Police prisoner transport vehicle was sitting on the Rite Aid lot.

25.     At approximately 5:42 p.m., TAIRU called the BGF member and advised him that there was a police officer on the lot of "the second restaurant" at which time the BGF member told TAIRU to go to "the first restaurant." At approximately the same time, surveillance units observed the BGF member exit his residence and enter a dark colored Honda that had pulled to the curb outside of the residence.

26.     At approximately 5:43 p.m., surveillance units followed TAIRU from the Rite Aid located at 250 West Chase Street to the Rite Aid located at 300 North MLK. Once the F-150 arrived at the Rite Aid, the two passengers exited the truck and entered the Rite Aid.

6

27.     At approximately 5:50 p.m., surveillance units observed the BGF member exit the Honda that had parked on the lot and enter the Ford F-150. At roughly the same time, law enforcement believed that the BGF member inadvertently placed a call because the call went to voicemail, but the line remained open. Over the open line, the sound of an opening and closing car door could be heard. Moments later, another car door was heard opening and the BGF member said, "hello my friend," to someone, believed to be TAIRU, before the car door was heard closing again. The BGF member then was overheard to tell TAIRU, "gimme that and give me two days. In two days I'll have all the money. Give me two days (inaudible)." After a brief inaudible exchange, the BGF member said, "Please give me that cause I have not had nothin. You know I really haven't. If you will trust me with that I will pay, you know (inaudible)..." The BGF member continued, "I'm talkin bout, you know, that relationship, you know." After a period where the conversation was difficult to understand, the BGF member told TAIRU, "All I need is time enough to let two or three other people to see what the fuck I got and they gonna (inaudible) to me with the money and I'll be able to call you and holler at a bunch of it."

28.     I believed, based on this conversation, that TAIRU and the BGF member were discussing the samples of the new heroin supply. I believed that TAIRU brought a quantity of heroin to the meeting, but only a portion of that heroin was for the BGF member. I believed that during this open line call, the BGF member was trying to persuade TAIRU to give him (the BGF member) the entire sample. The BGF member tried to assure TAIRU that it would only take him (the BGF member) two days to sell the sample and he (the BGF member) would return with the money from the sale of the heroin.

7

29.     At approximately 6:02 p.m., the BGF member was observed exiting the Ford F-150 and returning to the Honda.  The Honda then left the lot traveling northbound on MLK.  The Ford F-150 also left the area.

30.     At approximately 6:08 p.m., law enforcement initiated a traffic stop of the Honda Accord.  Both the BGF member and the driver of the Honda were both moving around in their seats, appeared nervous, and continued to fidget.  The two were requested to exit the vehicle.  During a search of the BGF member, law enforcement recovered an egg shaped object in a plastic bag (approximately 28 grams (one ounce)), which the detective immediately recognized to be consistent with the shape and size of wholesale packaged heroin.  Additionally, a search of the driver revealed a small quantity of suspected marijuana.  After both the BGF member and the driver were positively identified, both were released.

31.     The egg shaped object was later tested and found to be heroin.

32.     At approximately 6:41 p.m., the BGF member called TAIRU.  During the call, the BGF member told TAIRU that he (the BGF member) was stopped by the police and that the heroin had been seized.  The two discussed the fact that the stop was conducted by a uniformed patrolman in a marked car for not wearing a seatbelt.  The BGF member explained that the officer was not sure what the substance was, and indicated that the substance would have to be analyzed before a determination could be made regarding charges.  The BGF member then told TAIRU that they had to meet again because the police "took both of them."

33.     Based upon that conversation, I surmised that the BGF member had actually been in possession of two "eggs" of heroin and that the second "egg" was still in the BGF member's possession, but the BGF member misled TAIRU into believing that both "eggs"

were seized.

34.    On June 22, 2013, at approximately 7:33 p.m., the BGF member called TAIRU and again discussed being stopped by the police. TAIRU then asked the BGF member if he (the BGF member) wanted him (TAIRU) to bring another "picture [sample]" and the BGF member answered, "yes."

35.    After another series of conversations, TAIRU and the BGF member agreed to meet. At approximately 11:54 p.m., TAIRU called the BGF member and asked where he was. The BGF member replied that he was on his way, and TAIRU indicated he that he was at the meet location. I believed that the two were meeting so TAIRU could give the BGF member another quantity of heroin to replace the heroin seized by law enforcement. Although physical surveillance of this meeting was not conducted, a review of the GPS tracker affixed to the Ford F-150 showed that the vehicle arrived at the Rite Aid located in the 200 block of West Chase Street at approximately 11:58 p.m., and did not leave until approximately 12:11 a.m. This is the same location, "the second restaurant," identified during the surveillance conducted earlier that day.

36.    On July 23, 2013, at approximately 12:20 p.m., law enforcement was again monitoring the GPS tracker of Ford F-150. The electronic surveillance revealed that the vehicle was stopped in front of the address of the BGF member. Law enforcement then responded to the area, and located the vehicle parked and unoccupied. At approximately 1:50 p.m., law enforcement observed a black male approach the truck, enter the vehicle, and leave the area. The vehicle was followed and stopped. The driver of the vehicle was identified as Suraj Olasunkanmi TAIRU via his Maryland Driver's License. The address on the license was the

same location that law enforcement had previously observed the F-150 in Laurel, Maryland

37.   On September 11, 2013, TAIRU was taken into custody after law enforcement believed he would be in possession of 100 grams of heroin.  TAIRU arrived driving the same Ford F-150, but did not have any heroin on his person.  During a search conducted incident to his arrest, TAIRU was in possession of the cellular telephone with telephone number 202-256-5731.

38.   Also on September 11, 2013, law enforcement confirmed the identification of TAIRU as the individual operating the F-150 on June 22, 2013, and the individual that provided the heroin to the BGF member.

IV.   CONCLUSION

39.   Based upon the foregoing, I respectfully submit that there is probable cause to believe that Suraj TAIRU did, on June 22, 2013, distribute a quantity of heroin, in violation of 21 U.S.C. 841.


_____
TFO Craig Fester
Drug Enforcement Administration


Sworn to before me this _____ day of September, 2013.


_____
Susan K. Gauvey
UNITED STATES MAGISTRATE JUDGE


10